Barry I. Levy, Esq.
Max Gershenoff, Esq.
Caitlin Cash, Esq.
Peter Henninger, Esq.
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
max.gershenoff@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General Insurance*
*Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY CO., <br><br>                 Plaintiffs, <br><br>     –against– <br><br> GLENMORE MEDICAL, P.C., RONALD ALEXANDER DALY, M.D., CARLINE BOUBERT, P.A., CHEVERN BURNETT, P.A., SADYK FAYZULAYEV, P.A., JOSEPH HAN, P.A., JOSHUA LEONARDO, P.A., and LYUBOV MASHKABOVA, N.P., <br><br>                 Defendants. | Docket No.: _____( ) <br><br> **Plaintiffs Demand a Trial by Jury** |

**<u>COMPLAINT</u>**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $1,300,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges through Glenmore Medical, P.C. ("Glenmore Medical") for purported examinations, arthroscopic surgeries, and related services (collectively the "Fraudulent Services") that the Defendants purported to provide to automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.. In addition, Plaintiffs seek a declaration that they are not liable to pay the Defendants' outstanding billing for the Fraudulent Services, because of the fraudulent and unlawful conduct described herein.

2.     In particular, and as set forth more fully, below, the Defendants engaged in a scheme whereby they paid unlawful compensation in exchange for patient referrals, misrepresented the nature, extent, results, and medical necessity of the healthcare services they purported to provide, and falsely represented that they were in compliance with relevant law and eligible to receive no-fault insurance reimbursement in the first place, when in fact they were not.

3.     The Defendants are as follows:

(i)     Defendant Glenmore Medical is a New York medical professional corporation through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(ii)     Defendant Ronald Alexander Daly, M.D. ("Daly") is a physician who was licensed to practice medicine in New York on or about May 3, 2017, and in New Jersey on or about November 20, 1981. Daly purported to own and control Glenmore Medical, and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO.

(iii)     Defendant Carline Boubert, P.A. ("Boubert") is a physician assistant who was licensed in New York on or about July 3, 2001. Boubert was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

(iv)    Defendant Chevern Burnett, P.A. ("Burnett") is a physician assistant who was licensed in New York on or about December 14, 2011. Burnett was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

(v)    Defendant Sadyk Fayzulayev, P.A. ("Fayzulayev") is a physician assistant who was licensed in New York on or about July 12, 2000, and in New Jersey on or about July 29, 2011. Fayzulayev was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

(vi)    Defendant Joseph Han, P.A. ("Han") is a physician assistant who was licensed in New York on or about August 24, 2016, and in New Jersey on or about September 28, 2016. Han was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

(vii)    Defendant Joshua Leonardo, P.A. ("Leonardo") is a physician assistant who was licensed in New York on or about October 18, 2010, and in New Jersey on or about February 11, 2019. Leonardo was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

(viii)    Defendant Lyubov Mashkabova, N.P. ("Mashkabova") is a nurse practitioner who was licensed in New York on or about February 17, 2021. Mashkabova was associated with Glenmore Medical and Daly, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

4.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Defendants paid unlawful compensation in exchange for patient referrals;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iv)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)    the Fraudulent Services were not provided in compliance with relevant laws and regulations governing healthcare practice, including licensing laws, and, as a result, were not eligible for no-fault reimbursement in the first instance; and

(vi)    the Fraudulent Services were, in many cases, performed by independent contractors, rather than by Glenmore Medical's employees, and therefore were not eligible for no-fault reimbursement in the first instance.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they caused to be billed to GEICO. The chart annexed hereto as Exhibit "1" sets forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails.

6.    The Defendants' fraudulent and unlawful scheme began no later than June 2021 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,300,000.00.

## THE PARTIES

### I.    Plaintiffs

7.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

8.    Defendant Glenmore Medical is a New York medical professional corporation with its principal place of business in New York. Glenmore Medical was incorporated in New York on or about February 18, 2021, purported to be owned and controlled by Daly, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

9.    Defendant Daly resides in and is a citizen of New York. Daly was licensed to practice medicine in New York on or about May 3, 2017, and in New Jersey on or about November 20, 1981. Daly purported to own and control Glenmore Medical, purported to perform many of

the Fraudulent Services on behalf of Glenmore Medical, and used Glenmore Medical as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

10.     Defendant Boubert resides in and is a citizen of New York. Boubert is a physician assistant who was licensed in New York on or about July 3, 2001. Boubert was associated with Glenmore Medical and Daly as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

11.     Defendant Burnett resides in and is a citizen of New York. Burnett is a physician assistant who was licensed in New York on or about December 14, 2011. Burnett was associated with Glenmore Medical and Daly as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

12.     Defendant Fayzulayev resides in and is a citizen of New York. Fayzulayev is a physician assistant who was licensed in New York on or about July 12, 2000, and in New Jersey on or about July 29, 2011. Fayzulayev was associated with Glenmore Medical and Daly as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

13.     Defendant Han resides in and is a citizen of New York. Han is a physician assistant who was licensed in New York on or about August 24, 2016, and in New Jersey on or about September 28, 2016. Han was associated with Glenmore Medical and Daly as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

14.     Defendant Leonardo resides in and is a citizen of New York. Leonardo is a physician assistant who was licensed in New York on or about October 18, 2010, and in New Jersey on or about February 11, 2019. Leonardo was associated with Glenmore Medical and Daly

as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

15.    Defendant Mashkabova resides in and is a citizen of New York. Mashkabova is a nurse practitioner who was licensed in New York on or about February 17, 2021. Mashkabova was associated with Glenmore Medical and Daly as an independent contractor, and purported to perform many of the Fraudulent Services on behalf of Glenmore Medical.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

17.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

18.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the Pertinent Law Governing No-Fault Reimbursement**

20.    GEICO underwrites automobile insurance in New York.

21.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide no-fault insurance benefits ("PIP Benefits", "Personal Injury Protection Benefits", or "No-Fault Benefits") to Insureds.

22.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for healthcare goods and services, including medical services.

23.    An Insured can assign his/her right to No-Fault Benefits to healthcare services providers in exchange for those services.

24.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

25.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.    For example, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local

licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

27.    New York law prohibits licensed healthcare services providers, including licensed physicians, from paying or accepting compensation in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530; 6531; <u>see</u> <u>also</u> 8 N.Y.C.R.R. § 29.1.

28.    Therefore, a healthcare provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive No-Fault Benefits.

29.    New Jersey law prohibits foreign medical professional corporations from operating as medical practices in New Jersey. <u>See</u>, <u>e.g.</u>, N.J.S.A § 14A:17-5; N.J.A.C. 13:35-6.16.

30.    Therefore, under the No-Fault Laws, New York medical professional corporations may not collect No-Fault Benefits for services that they unlawfully provide in New Jersey.

31.    In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

32.    Pursuant to the No-Fault Laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of

healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

33.    Accordingly, for a healthcare services provider to be eligible to bill for and to collect No-Fault Benefits, it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

34.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

35.    When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

36.    Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    <u>The Defendants' Fraudulent and Unlawful Scheme</u>

37.    Beginning no later than 2021, and continuing through the present day, the Defendants engaged in a complex fraudulent and unlawful scheme in which they caused a large amount of fraudulent and unlawful no-fault insurance billing to be submitted to GEICO for medically

unnecessary, illusory, unlawful, and otherwise non-reimbursable healthcare services.

**A.    The Defendants' Unlawful Referral Scheme**

38.    In order to bill GEICO and other automobile insurers for the Fraudulent Services, the Defendants needed to obtain patient referrals from other healthcare providers. However, because the Fraudulent Services that the Defendants purported to provide were medically unnecessary, they could not obtain legitimate patient referrals from legitimate healthcare providers.

39.    Moreover, the Defendants did not advertise or market Glenmore Medical's services to the general public, and did not maintain any single, fixed treatment location for Glenmore Medical, which further impeded the Defendants' ability to obtain patient referrals from legitimate healthcare providers.

40.    Instead, the Defendants operated Glenmore Medical on an itinerant basis from a large number of multidisciplinary clinics located throughout the New York metropolitan area (the "No-Fault Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to No-Fault Clinics at the following locations:

(i)    552 East 180th Street, Bronx, New York 10457

(ii)    3960 Flatlands Avenue, Brooklyn, New York 11234

(iii)    180-09 Jamaica Avenue, Jamaica, New York 11432

(iv)    108-25 Merrick Boulevard, Jamaica, New York 11433

(v)    788 Southern Boulevard, Bronx, New York 10455

(vi)    550 Remsen Avenue, Brooklyn, New York 11236

(vii)    92-08 Jamaica Avenue, Woodhaven, New York 11421

(viii)    17004 Henley Road, Jamaica, New York 11432

    (ix)     146 Empire Boulevard, Brooklyn, New York 11225

    (x)     85 55 Little Neck Parkway, Floral Park, New York 11001

    (xi)     3407 White Plains Road, Bronx, New York 10467

    (xii)     1975 Linden Boulevard, Elmont, New York 11003

    (xiii)     21916 Linden Boulevard, Cambria Heights, New York 11411

    (xiv)     8217 Woodhaven Boulevard, Glendale, New York 11385

41.    Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, the No-Fault Clinics were in actuality set up as convenient, "one-stop" shops for no-fault insurance fraud.

42.    The Defendants gained access to the No-Fault Clinics by providing unlawful compensation, in exchange for patient referrals, to the owners of the No-Fault Clinics and to the other healthcare services providers (the "Referring Providers") that operated from the No-Fault Clinics, who controlled access to the No-Fault Clinics, as well as patient referrals at the No-Fault Clinics.

43.    The No-Fault Clinics and Referring Providers themselves wanted to submit as much fraudulent no-fault insurance billing as possible for purported chiropractic, physical therapy, acupuncture, and other services to GEICO and other insurers, without regard for whether the underlying services were medically necessary.

44.    However, to the extent that the Insureds in the claims set forth in Exhibit "1" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

45.    Because ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, the No-Fault Clinics

and Referring Providers knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy, acupuncture, and related billing to GEICO and other automobile insurers would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, acupuncture, and/or related services beyond an initial short course of conservative treatment.

46.    The No-Fault Clinics and Referring Providers also knew that it would be much easier for them to obtain payment on large amounts of no-fault insurance billing for medically unnecessary chiropractic, physical therapy, acupuncture, and related services if a licensed physician and his associates were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains, sprains, and similar soft tissue injuries.

47.    Accordingly, the No-Fault Clinics and Referring Providers entered into secret agreements with the Defendants, whereby the No-Fault Clinics and Referring Providers agreed to provide access to Insureds and refer Insureds to Glenmore Medical for expensive and medically unnecessary examinations and surgical procedures (i.e., the Fraudulent Services), despite the Insureds' lack of any genuine presenting problems that would warrant the examinations and procedures.

48.    In exchange, the Defendants provided unlawful compensation to the Referring Providers and to the individuals and entities that owned, operated, and controlled the No-Fault Clinics, in the form of: (i) ostensibly legitimate "rent" payments from Glenmore Medical and Daly to "lease" space at the No-Fault Clinics, which actually were disguised kickbacks paid in exchange for patient referrals; (ii) false "diagnoses" that purported to reflect that Insureds had suffered injuries more serious than ordinary strains and sprains, which created a false justification for the Referring Providers and No-Fault Clinics to bill and obtain payment for additional, medically

unnecessary services that they purported to provide to the Insureds; and (iii) return referrals from the Defendants back to the No-Fault Clinics and Referring Providers for the continued provision of medically unnecessary chiropractic, physical therapy, acupuncture, and related healthcare services, which likewise enabled the No-Fault Clinics and Referring Providers to obtain payments for medically unnecessary services that otherwise would have been unavailable to them.

49.     In reality, these were "pay-to-play" arrangements that caused the No-Fault Clinics and Referring Providers to provide access to Insureds and to refer the Insureds to Glenmore Medical for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

50.     In keeping with the fact that the ostensibly legitimate "rent" payments to the Clinics actually were disguised compensation in exchange for patient referrals, the Defendants operated Glenmore Medical from the No-Fault Clinics on only an occasional basis.

51.     For example, the Defendants did not maintain regular office hours at the No-Fault Clinics. Rather, they appeared at the No-Fault Clinics sporadically, on different days each month, only when No-Fault Clinics and Referring Providers had patients to refer to Glenmore Medical pursuant to the unlawful referral scheme.

52.     Moreover – and again, in keeping with the fact that the ostensibly legitimate "rent" payments from Glenmore Medical and Daly actually were disguised compensation in exchange for patient referrals – the No-Fault Clinics did not have any external signage or indicia of the Defendants' ongoing presence at the offices.

53.     Furthermore, when the Defendants would operate from the No-Fault Clinics, almost all of the patients they saw at the No-Fault Clinics were patients who were referred to them by the Referring Providers who worked at the No-Fault Clinics, and who – together with the

owners of the No-Fault Clinics – controlled access to the No-Fault Clinics.

54.     In addition to the ersatz "rent" payments, the Defendants' false contentions that Insureds continued to suffer from significant levels of pain, functional deficits, and related symptoms as the result of their minor automobile accidents, and the Defendants' medically unnecessary return referrals of those Insureds back to the Referring Providers and the No-Fault Clinics, constituted unlawful compensation to the Referring Providers and the No-Fault Clinics for their initial referrals of Insureds to the Defendants. In particular, the Defendants' false contentions, false diagnoses, and medically unwarranted return referrals provided a false justification for the Referring Providers and No-Fault Clinics to continue to bill and obtain payment for the medically unnecessary chiropractic, physical therapy, acupuncture, and related healthcare services that they purported to provide to the Insureds.

55.     In keeping with the fact that the Defendants paid unlawful compensation in exchange for patient referrals, many Insureds identified in Exhibit "1" had yet to fail a legitimate course of conservative treatment before being referred to the Defendants for the Fraudulent Services.

56.     In a legitimate clinical setting, referrals of soft tissue injury patients for orthopedic services such as those that the Defendants purported to provide generally will be improper unless the patients have first failed a legitimate course of conservative treatment. This is because soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment or no treatment at all, and because orthopedic services, including arthroscopic surgeries, are more invasive and pose a greater risk to patients than more conservative forms of treatment

57.     Even so, in the claims identified in Exhibit "1", the Defendants, pursuant to their unlawful referral scheme, often received medically unnecessary orthopedic referrals from the No-

Fault Clinics and Referring Providers before the Insureds could have legitimately failed a course of conservative treatment, and then compensated the No-Fault Clinics and Referring Providers with false "diagnoses" and medically unnecessary return referrals.

58.    For example:

(i)    On July 27, 2021, an Insured named PO was involved in an automobile accident. The contemporaneous police report indicated that PO was not injured as a result of the accident. The police report further indicated that PO's vehicle was drivable following the accident. In keeping with the fact that PO was not seriously injured as a result of the accident, PO did not visit any hospital emergency department following the accident. To the extent PO experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on July 29, 2021, PO sought treatment at a No-Fault Clinic located at 82-17 Woodhaven Boulevard, Glenmore, New York. Then, on August 23, 2021, less than one month after PO began receiving conservative treatment at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and before PO could have failed a legitimate course of conservative treatment, Daly purported to examine PO on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred PO back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before PO could have legitimately failed a course of conservative treatment, and the subsequent return referral from Glenmore Medical, were products of an unlawful referral agreement.

(ii)   On October 8, 2021, an Insured named SG was involved in an automobile accident. The motor vehicle accident report, completed by SG, indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured as a result of the accident, SG was not treated at the scene of the accident, nor did SG visit any hospital emergency department following the accident. To the extent SG experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on October 12, 2021, SG sought treatment at a No-Fault Clinic located at 3432-05 East Tremont Avenue, Bronx, New York. Then, on December 1, 2021, less than two months after SG began receiving conservative treatment at the No-Fault Clinic and before SG could have failed any legitimate course of conservative treatment, Boubert purported to examine SG on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred SG back to the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before SG could

have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(iii) On October 31, 2021, an Insured named MT was involved in an automobile accident. Following the accident, MT was not treated at the scene of the accident, nor did MT visit any hospital emergency department following the accident. To the extent MT experienced any injuries as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on November 1, 2021, MT sought treatment at a No-Fault Clinic located at 108-25 Merrick Blvd., Jamaica, New York. Then, on December 28, 2021, less than two months after MT began receiving conservative treatment at the No-Fault Clinic and before MT could have failed any legitimate course of conservative treatment, Burnett purported to examine MT on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred MT back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic and Burnett before MT could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(iv) On November 9, 2021, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that MI's vehicle was drivable following the accident. The police report further indicated that MI was not transported to the hospital following the accident. Nonetheless, later that day, MI self-presented to LIJ Medical Center where MI was briefly observed on an outpatient basis and discharged shortly thereafter with no serious injury diagnosis. To the extent MI experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on November 12, 2021, MI sought treatment at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York. Then, on December 21, 2021, less than two months after MI began receiving conservative treatment at the No-Fault Clinic and before MI could have failed any legitimate course of conservative treatment, Burnett purported to examine MI on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred MI back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic and Burnett before MI could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(v) On April 8, 2022, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that AP's vehicle was drivable following the accident. The police report further indicated that AP was not injured as a result of the accident. In keeping with the fact that AP was not seriously injured

as a result of the accident, AP did not visit any hospital emergency department following the accident. To the extent AP experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on April 11, 2022, AP sought treatment at a No-Fault Clinic located at 615 Seneca Avenue, Suite 1F, Ridgewood, New York. Then, on May 25, 2022, less than two months after AP began receiving conservative treatment at the No-Fault Clinic and before AP could have failed any legitimate course of conservative treatment, Mashkabova purported to examine AP on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred AP back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before AP could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(vi)     On April 27, 2022, an Insured named NS was involved in an automobile accident. The contemporaneous police report indicated that NS's vehicle was drivable following the accident. The police report further indicated that NS was not injured as a result of the accident. In keeping with the fact that NS was not seriously injured as a result of the accident, NS did not visit any hospital emergency department following the accident. To the extent NS experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on April 29, 2022, NS sought treatment at a No-Fault Clinic located at 3960 Flatlands Avenue, Brooklyn, New York. Then, on May 18, 2022, less than one month after NS began receiving conservative treatment at the No-Fault Clinic and before NS could have failed any legitimate course of conservative treatment, Mashkabova purported to examine NS on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred NS back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before NS could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(vii)    On May 19, 2022, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured as a result of the accident. The police report further indicated that AA did not visit any hospital emergency department following the accident. To the extent AA experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on May 20, 2022, AA sought treatment at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York. Then, on August 9, 2022, less than three months after AA began receiving conservative treatment at the No-Fault Clinic and before AA could have failed any legitimate course of conservative treatment, Burnett purported to examine AA on

behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred AA back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before AA could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(viii)   On October 20, 2022, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at the scene. In keeping with the fact that JS was not seriously injured as a result of the accident, JS was not treated at the scene of the accident, nor did JS visit any hospital emergency department following the accident. To the extent JS experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on October 24, 2022, JS sought treatment at a No-Fault Clinic located at 552 East 180th Street, Bronx, New York. Then, on November 28, 2022, just over one month after JS began receiving conservative treatment at the No-Fault Clinic and before JS could have failed any legitimate course of conservative treatment, Boubert purported to examine JS on behalf of Glenmore Medical at the No-Fault Clinic and referred JS back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before JS could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(ix)   On May 31, 2023, an Insured named KW was involved in an automobile accident. The contemporaneous police report indicated that KW's vehicle was drivable following the accident. The police report further indicated that KW was not injured as a result of the accident. In keeping with the fact that KW was not seriously injured as a result of the accident, KW did not visit any hospital emergency department following the accident. To the extent KW experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on June 6, 2023, KW sought treatment at a No-Fault Clinic located at 108-25 Merrick Boulevard, Jamaica, New York. Then, on August 21, 2023, less than three months after KW began receiving conservative treatment at the No-Fault Clinic and before KW could have failed any legitimate course of conservative treatment, Burnett purported to examine KW on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred KW back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before KW could have

legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

(x)    On August 31, 2023, an Insured named RB was involved in an automobile accident. Following the accident, RB did not visit any hospital emergency department following the accident. To the extent RB experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Thereafter, beginning on August 31, 2023, RB sought treatment at a No-Fault Clinic located at 108-09 Jamaica Avenue, Jamaica, New York. Then, on October 16, 2023, less than two months after RB began receiving conservative treatment at the No-Fault Clinic and before RB could have failed any legitimate course of conservative treatment, Burnett purported to examine RB on behalf of Glenmore Medical at the No-Fault Clinic, falsely diagnosed the Insured with a series of illusory symptoms and injuries, and referred RB back to the Referring Provider and the No-Fault Clinic for additional, medically unnecessary physical therapy services. The initial, medically unnecessary referral to Glenmore Medical by the Referring Provider/No-Fault Clinic before RB could have legitimately failed a course of conservative treatment, and the subsequent return referral, were products of an unlawful referral agreement.

59.    These are only representative examples. In the claims identified in Exhibit "1", the Defendants, pursuant to their unlawful referral scheme, routinely received medically unnecessary orthopedic referrals from the No-Fault Clinics and Referring Providers before the Insureds could have legitimately failed a course of conservative treatment, and then compensated the No-Fault Clinics and Referring Providers with false diagnoses and medically unnecessary return referrals.

60.    In further keeping with the fact that the No-Fault Clinics' and Referring Providers' referrals to Glenmore Medical were not based on medical necessity, and instead were the product of an unlawful referral scheme, on many occasions, the No-Fault Clinics and Referring Providers caused multiple Insureds who had been involved in the same underlying minor accident to be referred to Glenmore Medical for the provision of Fraudulent Services on or about the same date after their common accident, despite the fact that the Insureds were differently situated.

61.    In this context, it is improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer

substantially similar injuries as the result of their accidents or require a substantially similar course of treatment.

62.    It likewise is improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" not only would suffer substantially similar injuries as the result of their accidents, but that their respective injuries would fail to resolve at such an identical rate that they would all require referrals to Glenmore Medical for Fraudulent Services on or about the same date after their common accident.

63.    It is even more improbable – to the point of impossibility – that this would occur repeatedly within the cohort of patients being treated at a single medical practice such as Glenmore Medical.

64.    Even so, in the claims identified in Exhibit "1", the No-Fault Clinics and Referring Providers routinely caused multiple Insureds who had been involved in the same underlying minor accident to be referred to Glenmore Medical for the provision of medically unnecessary Fraudulent Services on or about the same date after their common accident, despite the fact that the Insureds were differently situated, and in any case did not legitimately require the referrals.

65.    For example:

(i)    On June 24, 2021, two Insureds – WC and DB – were involved in the same automobile accident. Thereafter, WC and DB sought treatment from a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York. WC and DB were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused WC and DB to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, September 8, 2021..

(ii)    On August 20, 2021, two Insureds – JS and MV – were involved in the same automobile accident. Thereafter, JS and MV sought treatment from a No-Fault Clinic located at 3432-05 East Tremont Avenue, Bronx, New York. JS and MV were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused JS and MV to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, November 16, 2021.

(iii)    On June 9, 2022, <u>three</u> Insureds – SO, OD, and RV– were involved in the same automobile accident. Thereafter, SP, OD, and RV sought treatment from a No-Fault Clinic located at 32-09 Fulton Street, Brooklyn, New York. SP, OD, and RV were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic s caused SP, OD, and RV to be referred to Glenmore Medical for the provision of the Fraudulent Services – incredibly, on the exact same date, September 1, 2022.

(iv)    On June 23, 2022, two Insureds – DR and RR – were involved in the same automobile accident. Thereafter, DR and RR sought treatment from a No-Fault Clinic located at 82-17 Woodhaven Boulevard, Glendale, New York. DR and RR were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused DR and RR to be referred to Glenmore Medical for the provision of the Fraudulent Services – incredibly, on the exact same date, October 18, 2022.

(v)    On September 2, 2022, two Insureds – RC and AR – were involved in the same automobile accident. Thereafter, RC and AR sought treatment from a No-Fault Clinic located at 550 Remsen Avenue, Brooklyn, New York. RC and AR were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to

the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused RC and AR to be referred to Glenmore Medical for the provision of the Fraudulent Services – incredibly, on the exact same date, December 27, 2022.

(vi)   On September 19, 2022, two Insureds – EM and KS – were involved in the same automobile accident. Thereafter, EM and KS sought treatment from a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York. EM and KS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused EM and KS to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, November 8, 2022.

(vii)  On September 23, 2022, <u>three</u> Insureds – RA, RA, and MT – were involved in the same automobile accident. Thereafter, RA, RA, and MT sought treatment from a No-Fault Clinic located at 82-17 Woodhaven Boulevard, Glendale, New York. RA, RA, and MT were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused RA, RA, and MT to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, December 8, 2022.

(viii) On December 19, 2022, two Insureds – JS and VW– were involved in the same automobile accident. Thereafter, JS and VW sought treatment from a No-Fault Clinic located at 700 Rockaway Turnpike, Lawrence, New York. JS and VW were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful

compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused JS and VW to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, January 17, 2023.

(ix)    On June 3, 2023, two Insureds – SH and SM– were involved in the same automobile accident. Thereafter, SH and SM sought treatment from a No-Fault Clinic located at 84-11 Queens Boulevard, Flushing, New York. SH and SM were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused SH and SM to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, November 15, 2023.

(x)    On October 16, 2023, two Insureds – SC and LN– were involved in the same automobile accident. Thereafter, SC and LN sought treatment from a No-Fault Clinic located at 85-55 Little Neck Parkway, Floral Park, New York. SC and LN were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that the Insureds suffered any injuries at all, the injuries resolved at different rates. The Insureds did not require referrals to Glenmore Medical on or about the same date, weeks or months after their common accident. Even so, in exchange for unlawful compensation from Glenmore Medical and Daly, a Referring Provider at the No-Fault Clinic caused SC and LN to be referred to Glenmore Medical for the provision of Fraudulent Services – incredibly, on the exact same date, November 21, 2023.

66.    These are only representative examples. In the claims identified in Exhibit "1", the No-Fault Clinics and Referring Providers routinely caused multiple Insureds who had been involved in the same underlying minor accident to be referred to Glenmore Medical for the provision of medically unnecessary Fraudulent Services on or about the same date after their common accident, despite the fact that the Insureds were differently situated, and in any case did not legitimately require the referrals.

67.    In the claims identified in Exhibit "1", the No-Fault Clinics and Referring Providers routinely caused Insureds to be referred to Glenmore Medical for medically unnecessary

Fraudulent Services because the Defendants provided them with unlawful compensation in exchange for the referrals.

**B.      Defendants' Fraudulent Treatment and Billing Protocol**

**1.      The Fraudulent Charges for Initial Examinations**

68.      Upon receiving a referral pursuant to the unlawful compensation that the Defendants paid to the Referring Providers and the No-Fault Clinics, Glenmore Medical purported to provide virtually all of the Insureds in the claims identified in Exhibit "1" with initial examinations, which typically purportedly were performed by either Daly, Boubert, Burnett, or Mashkabova.

69.      Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova then typically billed the purported initial examinations to GEICO under CPT code 99205, typically resulting in a charge of $275.00 for each initial examination they purported to provide.

70.      In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect No-Fault Benefits in the first instance. In fact, the Defendants were not in compliance with all material laws and regulations governing healthcare practice, including licensing laws, and therefore were not entitled to collect No-Fault Benefits in the first instance.

71.      Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

72.      In the claims for initial examinations under CPT code 99205 that are identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely misrepresented the severity of the Insureds' presenting problems.

73.     Pursuant to the Fee Schedule and the American Medical Association's CPT Assistant, which governs the use of CPT codes, the use of CPT code 99205 to bill for an initial patient examination typically requires that the patient present with problems of moderate to high severity.

74.     Pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99205 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

75.     For instance, the CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99205 to bill for an initial patient examination. In particular:

(i)     Initial office evaluation of a 65-year-old female with exertional chest pain, Intermittent claudication, syncope and a murmur of aortic stenosis. (Cardiology)

(ii)    Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, anti hypertension. (Family Medicine)

(iii)   Initial office visit for a 73-year-old male with an unexplained 20-pound weight loss. (Hematology/Oncology)

(iv)    Initial office visit for a 24-year-old homosexual male who has a fever, a cough, and shortness of breath. (Infectious Disease)

(v)     Initial office evaluation, patient with systemic lupus erythematosus, fever, seizures and profound thrombocytopenia. (Rheumatology)

(vi)    Initial office evaluation and management of patient with systemic vasculitis and compromised circulation to the limbs. (Rheumatology)

76.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

77.    In keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or their problems were of low or minimal severity, in the claims identified in Exhibit "1", the Insureds typically did not seek treatment at any hospital emergency department as the result of their accidents.

78.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft-tissue injury diagnosis.

79.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

80.    Even so, in the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely billed for their putative initial examinations using CPT code 99205, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

81.    For example:

(i)    On June 25, 2021, an Insured named JM was involved in an automobile accident. The motor vehicle accident report indicated that the police were not called as a result of the accident. In keeping with the fact that JM was not seriously injured as a result of the accident, JM did not visit any hospital emergency department following the accident. To the extent JM experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of JM by Mashkabova, on behalf of Glenmore Medical, on December 6, 2021, Glenmore Medical, Daly, and Mashkabova billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)     On October 8, 2021, an Insured named SG was involved in an automobile accident. The motor vehicle accident indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured as a result of the accident, SG did not visit any hospital emergency department following the accident. To the extent SG experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of SG by Burnett, on behalf of Glenmore Medical, on December 1, 2021, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On December 13, 2021, an Insured named JR was involved in an automobile accident. The motor vehicle accident report indicated that JR was not injured as a result of the accident. In keeping with the fact that JR was not seriously injured as a result of the accident, JR was not transported to any hospital emergency department following the accident. To the extent JR experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of JR by Boubert, on behalf of Glenmore Medical, on October 6, 2022, Glenmore Medical, Daly, and Boubert billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On January 4, 2022, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured as a result of the accident. In keeping with the fact that CH was not seriously injured as a result of the accident, CH did not visit any hospital emergency department following the accident. To the extent CH experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of CH by Burnett, on behalf of Glenmore Medical, on March 22, 2022, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On April 3, 2022, an Insured named RN was involved in an automobile accident. The contemporaneous police accident report indicated that RN was not injured and did not complain of any pain at the scene. In keeping with the fact that RN was not seriously injured as a result of the accident, RN was not treated at the scene of the accident, nor did RN visit any hospital emergency department following the accident. To the extent RN experienced any injuries at all as a result of the accident,

they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of RN by Mashkabova, on behalf of Glenmore Medical, on May 10, 2022, Glenmore Medical, Daly, and Mashkabova billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On September 2, 2022, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured and did not complain of any pain at the scene. Nonetheless, RC presented later that day to Mt. Sinai Brooklyn Hospital where RC was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that RC experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of RC by Boubert, on behalf of Glenmore Medical, on December 27, 2022, Glenmore Medical, Daly, and Boubert billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On September 6, 2022, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured as a result of the accident. In keeping with the fact that JC was not seriously injured as a result of the accident, JC did not visit any hospital emergency department following the accident. To the extent JC experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of JC by Burnett, on behalf of Glenmore Medical, on October 12, 2022, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On October 20, 2022, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured as a result of the accident. In keeping with the fact that JS was not seriously injured as a result of the accident, JS did not visit any hospital emergency department following the accident. To the extent JS experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of JS by Boubert, on

28

behalf of Glenmore Medical, on November 28, 2022, Glenmore Medical, Daly, and Boubert billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On February 9, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that JP was not injured as a result of the accident. The police report further indicated that JP did not visit any hospital emergency department following the accident. To the extent JP experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of JP by Daly, on behalf of Glenmore Medical, on March 9, 2023, Glenmore Medical and Daly billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)    On November 24, 2023, an Insured named MO was involved in an automobile accident. The contemporaneous police report indicated that MO's vehicle was drivable following the accident. The police report further indicated that MO was not injured as a result of the accident. In keeping with the fact that MO was not seriously injured as a result of the accident, MO did not visit any hospital emergency department following the accident. To the extent MO experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, following a purported initial examination of MO by Daly, on behalf of Glenmore Medical, on August 21, 2023, Glenmore Medical and Daly billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

82.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were of low or minimal severity, to the extent that they had any presenting problems at all at the time of the putative examinations.

83.    In the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the

putative examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

84.     In the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, and to create a false basis for continued medically unnecessary "treatment" by the No-Fault Clinics and Referring Providers, as unlawful compensation for their initial referrals of Insureds to the Defendants.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

85.     Pursuant to the Fee Schedule and the CPT Assistant, the use of CPT code 99205 to bill for an initial examination represents that the physician or other healthcare provider who performed the examination spent at least 60 minutes of time performing the examination.

86.     However, in the claims identified in Exhibit "1" for initial examinations under CPT code 99205, Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova misrepresented and exaggerated the amount of time that Daly, Boubert, Burnett, and Mashkabova spent performing the putative examinations.

87.     In the claims for initial examinations identified in Exhibit "1", neither Daly, Boubert, Burnett, Mashkabova, nor any other healthcare provider associated with Glenmore Medical spent more than 15-20 minutes of time performing the examinations, to the extent that the examinations actually were performed in the first instance.

88.     For instance, and in keeping with the fact that the initial examinations provided through Glenmore Medical did not require more than 15 or 20 minutes of time to perform, Daly,

Boubert, Burnett, and Mashkabova used template forms in purporting to conduct the initial examinations.

89.     All that was required to complete the template forms for initial examinations was a brief patient interview and limited physical examination of the patient, involving a limited number of examination parameters.

90.     These interviews and examinations did not require Daly, Boubert, Burnett, Mashkabova, or any other healthcare provider associated with Glenmore Medical, to spend more than 15 or 20 minutes of time performing the examinations, to the extent that they were ever performed at all.

91.     In the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely falsely represented that the examinations took at least 60 minutes to perform in order to create a false basis for their charges under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at a higher rate than examinations that require less time to perform.

c.      **Misrepresentations Regarding the Extent of Medical Decision-Making**

92.     Pursuant to the Fee Schedule and the CPT Assistant, the use of CPT code 99205 to bill for a patient examination represents that the physician or other healthcare provider who performed the examination engaged in legitimate, "high complexity" medical decision-making in connection with the examination.

93.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

94.     As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate high complexity medical decision-making, and therefore support the use of CPT code 99205 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

95.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

96.     The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate high complexity medical decision-making.

97.     First, in virtually every claim for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of the Insureds' preexisting medical records, diagnostic tests, or other information. When the Insureds presented to Glenmore Medical for the putative initial examinations, they did not arrive with any significant medical records.

98.     Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any continuing complaints arising from automobile accidents at all.

99.     Third, in the claims for initial examinations identified in Exhibit "1", Daly, Boubert, Burnett, and Mashkabova did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

100.    Rather, in the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova prepared initial examination reports in which they provided a false series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

101.    Then, based upon these false "diagnoses", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova directed Insureds: (i) to undergo arthroscopic and/or other surgical procedures, regardless of whether those procedures were warranted in the first instance, and/or (ii) to continue to receive medically unnecessary chiropractic, physical therapy, acupuncture, and related services from the No-Fault Clinics and Referring Providers, despite the fact that the Insureds typically had already received extensive chiropractic, physical therapy, and acupuncture services that supposedly had not resolved their purported symptoms.

102.    For example:

(i)    On June 25, 2021, an Insured named JM was involved in an automobile accident. The motor vehicle accident report indicated that the police were not called as a result of the accident. In keeping with the fact that JM was not seriously injured as a result of the accident, JM did not visit any hospital emergency department following the accident. To the extent JM experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, on December 6, 2021, Mashkabova, on behalf of Glenmore Medical, purported to conduct an initial examination of JM. Mashkabova did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Mashkabova did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mashkabova provided JM with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither JM's presenting problems, nor the treatment plan provided to JM by Mashkabova presented any risk of significant complications, morbidity, or mortality. To the contrary, JM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mashkabova consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to JM. Even so, Glenmore Medical, Daly, and Mashkabova billed

GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Mashkabova engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ii)     On October 8, 2021, an Insured named SG was involved in an automobile accident. The motor vehicle accident report completed by SG indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured as a result of the accident, SG did not visit any hospital emergency department following the accident. To the extent SG experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, on December 1, 2021, Burnett, on behalf of Glenmore Medical, purported to conduct an initial examination of SG. Burnett did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Burnett did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Burnett provided SG with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither SG's presenting problems, nor the treatment plan provided to SG by Burnett, presented any risk of significant complications, morbidity, or mortality. To the contrary, SG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Burnett consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to SG. Even so, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Burnett engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iii)     On November 9, 2021, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that MI's vehicle was drivable following the accident. The police report further indicated that MI was not injured, did not complain of any pain at the scene, and was not treated at the scene of the accident. Nonetheless, MI presented to LIJ Hospital following the accident and was discharged shortly thereafter with no serious injury diagnosis. To the extent MI experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, on December 21, 2021, Burnett, on behalf of Glenmore Medical, purported to conduct an initial examination of MI. Burnett did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Burnett did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Burnett provided MI with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither MI's presenting

problems, nor the treatment plan provided to MI by Burnett, presented any risk of significant complications, morbidity, or mortality. To the contrary, MI did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Burnett consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to MI. Even so, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Burnett engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iv)    On December 13, 2021, an Insured named JR was involved in an automobile accident. The motor vehicle accident report indicated that JR was not injured as a result of the accident. In keeping with the fact that JR was not seriously injured as a result of the accident, JR was not transported to any hospital emergency department following the accident. To the extent JR experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, on October 6, 2022, Boubert, on behalf of Glenmore Medical, purported to conduct an initial examination of JR. Boubert did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Boubert did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Boubert provided JR with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Boubert, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Boubert consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to JR. Even so, Glenmore Medical, Daly, and Boubert billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Boubert engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)    On April 2, 2022, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that BM's airbags did not deploy, and BM's vehicle sustained functional damage. BM was transported to Norwalk Hospital, Norwalk, Connecticut, following the accident and was discharged shortly thereafter with no serious injury diagnosis. To the extent that BM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, on June 13, 2022, Daly, on behalf of Glenmore Medical, purported to conduct an initial examination of BM. Daly did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond

basic radiology testing reports. Moreover, Daly did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Daly provided BM with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither BM's presenting problems, nor the treatment plan provided to BM by Daly, presented any risk of significant complications, morbidity, or mortality. To the contrary, BM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Daly consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to BM. Even so, Glenmore Medical and Daly billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Daly engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vi)     On April 3, 2022, an Insured named RN was involved in an automobile accident. The contemporaneous police accident report indicated that RN was not injured and did not complain of any pain at the scene. In keeping with the fact that RN was not seriously injured as a result of the accident, RN was not treated at the scene of the accident, nor did RN visit any hospital emergency department following the accident. To the extent RN experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, on May 10, 2022, Mashkabova, on behalf of Glenmore Medical, purported to conduct an initial examination of RN. Mashkabova did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Mashkabova did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mashkabova provided RN with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither RN's presenting problems, nor the treatment plan provided to RN by Mashkabova, presented any risk of significant complications, morbidity, or mortality. To the contrary, RN did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mashkabova consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to RN. Even so, Glenmore Medical, Daly, and Mashkabova billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Mashkabova engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vii)    On May 18, 2022, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured as a result of the accident, SA was not treated at the scene of the accident,

nor did SA visit any hospital emergency department following the accident. To the extent SA experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, on August 24, 2022, Burnett, on behalf of Glenmore Medical, purported to conduct an initial examination of SA. Burnett did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Burnett did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Burnett provided SA with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither SA's presenting problems, nor the treatment plan provided to SA by Burnett, presented any risk of significant complications, morbidity, or mortality. To the contrary, SA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Burnett consisted of medically unnecessary arthroscopic surgery, which, if performed correctly, did not pose any significant risk to SA. Even so, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Burnett engaged in some legitimate, high complexity medical decision-making during the purported examination.

(viii)  On September 2, 2022, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured and did not complain of any pain at the scene. Nonetheless, RC presented later that day to Mt. Sinai Brooklyn Hospital where RC was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that RC experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had either completely resolved or were minimal within a few weeks of the accident. Even so, on December 27, 2022, Boubert, on behalf of Glenmore Medical, purported to conduct an initial examination of RC. Boubert did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Boubert did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Boubert provided RC with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither RC's presenting problems, nor the treatment plan provided to RC by Boubert, presented any risk of significant complications, morbidity, or mortality. To the contrary, RC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Boubert consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to RC. Even so, Glenmore Medical, Daly, and Boubert billed GEICO for the initial examination

using CPT code 99205, and thereby falsely represented that Boubert engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ix)    On May 31, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured as a result of the accident. In keeping with the fact that MM was not seriously injured as a result of the accident, MM did not visit any hospital emergency department following the accident. To the extent MM experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, on August 21, 2023, Daly, on behalf of Glenmore Medical, purported to conduct an initial examination of MM. Daly did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Daly did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Daly provided MM with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Daly, presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Daly consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to MM. Even so, Glenmore Medical and Daly billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Daly engaged in some legitimate, high complexity medical decision-making during the purported examination.

(x)    On May 31, 2023, an Insured named KW was involved in an automobile accident. The contemporaneous police accident report indicated that KW was not injured and did not complain of any pain at the scene. In keeping with the fact that KW was not seriously injured as a result of the accident, KW was not treated at the scene of the accident, nor did KW visit any hospital emergency department following the accident. To the extent KW experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, on August 21, 2023, Burnett, on behalf of Glenmore Medical, purported to conduct an initial examination of KW. Burnett did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Burnett did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Burnett provided KW with substantially the same, false list of soft tissue injury "diagnoses" that Glenmore Medical provided to virtually every other insured. Furthermore, neither

KW's presenting problems, nor the treatment plan provided to KW by Burnett, presented any risk of significant complications, morbidity, or mortality. To the contrary, KW did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Burnett consisted of medically unnecessary arthroscopic surgery, in addition to medically unnecessary physical therapy, which, if performed correctly, did not pose any significant risk to KW. Even so, Glenmore Medical, Daly, and Burnett billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Burnett engaged in some legitimate, high complexity medical decision-making during the purported examination.

103.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova falsely represented that the examinations involved legitimate, high complexity medical decision-making, when in fact they did not.

104.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

105.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

106.    As set forth above, virtually all of the Insureds whom Defendants purported to treat were involved in relatively minor accidents.

107.    It is improbable that any two Insureds involved in any one of these minor automobile accidents would suffer substantially similar injuries as the result of their accidents or require a substantially similar course of treatment, or that their injuries would fail to resolve at such an identical rate that they would all require referrals to Glenmore Medical for Fraudulent Services on or about the same date after their common accident.

108.    It is even more improbable – to the point of impossibility – that this would occur repeatedly within the cohort of Insureds who purported to receive initial examinations at Glenmore

Medical, with multiple Insureds who had been in the same, underlying, minor accident presenting at Glenmore Medical with substantially similar injuries on or about the same date days, weeks, or even months after their accidents.

109.    Even so, and in keeping with the fact that Defendants' putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no legitimate medical decision-making at all, Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova frequently issued substantially similar, false "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

110.    For example:

(i)     On June 24, 2021, two Insureds – WC and DB – were involved in an automobile accident. Thereafter, WC and DB both presented – incredibly – on the exact same date, September 8, 2021, to Glenmore Medical for initial examinations by Daly. WC and DB were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WC and DB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Daly, on behalf of Glenmore Medical, provided WC and DB with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(ii)    On October 31, 2021, two Insureds – MT and KT – were involved in an automobile accident. Thereafter, MT and KT both presented – incredibly – on the exact same date, December 28, 2021, to Glenmore Medical for initial examinations by Burnett. MT and KT were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MT and KT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Burnett, on behalf of Glenmore Medical, provided MT and KT with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(iii)   On October 31, 2021, two Insureds – KM and VM – were involved in an automobile accident. Thereafter, KM and VM both presented – incredibly – on the exact same date, December 15, 2021, to Glenmore Medical for initial examinations by Mashkabova. KM and VM were both different ages, in different physical condition,

and experienced the impact from different locations in the vehicle. To the extent that KM and VM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Mashkabova, on behalf of Glenmore Medical, provided KM and VM with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(iv)    On November 10, 2021, <u>three</u> Insureds – DD, RM, and YG – were involved in an automobile accident. Thereafter, DD, RM, and YG all presented – incredibly – on the exact same date, January 17, 2022, to Glenmore Medical for initial examinations by Mashkabova. DD, RM, and YG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DD, RM, and YG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Mashkabova, on behalf of Glenmore Medical, provided DD, RM, and YG with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for all three of them.

(v)    On June 9, 2022, <u>three</u> Insureds – SP, OD, and RV – were involved in an automobile accident. Thereafter, SP, OD, and RV all presented – incredibly – on the exact same date, September 1, 2022, to Glenmore Medical for initial examinations by Boubert. SP, OD, and RV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SP, OD, and RV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Boubert, on behalf of Glenmore Medical, provided SP, OD, and RV with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for all three of them.

(vi)    On September 2, 2022, two Insureds – RC and AR – were involved in an automobile accident. Thereafter, RC and AR both presented – incredibly – on the exact same date, December 27, 2022, to Glenmore Medical for initial examinations by Boubert. RC and AR were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RC and AR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Boubert, on behalf of Glenmore Medical, provided RC and AR with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(vii)    On September 19, 2022, two Insureds – EM and KS – were involved in an automobile accident. Thereafter, EM and KS both presented – incredibly – on the exact same date, November 8, 2022, to Glenmore Medical for initial examinations by Mashkabova. EM and KS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EM and KS suffered any injuries at all in their accident, the injuries

were different. Even so, at the conclusion of the putative initial examinations, Mashkabova, on behalf of Glenmore Medical, provided EM and KS with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(viii)    On September 23, 2022, three Insureds – RA, RA, and MT – were involved in an automobile accident. Thereafter, RA, RA, and MT all presented – incredibly – on the exact same date, December 8, 2022, to Glenmore Medical for initial examinations by Boubert. RA, RA, and MT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RA, RA, and MT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Boubert, on behalf of Glenmore Medical, provided RA, RA, and MT with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for all three of them.

(ix)    On December 19, 2022, two Insureds – CS and VW – were involved in an automobile accident. Thereafter, CS and VW both presented – incredibly – on the exact same date, January 17, 2023, to Glenmore Medical for initial examinations by Burnett. CS and VW were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CS and VW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Burnett, on behalf of Glenmore Medical, provided CS and VW with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

(x)    On September 12, 2023, two Insureds – KA and HG – were involved in an automobile accident. Thereafter, KA and HG both presented – incredibly – on the exact same date, October 10, 2023, to Glenmore Medical for initial examinations by Boubert. KA and HG were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KA and HG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Boubert, on behalf of Glenmore Medical, provided KA and HG with substantially similar "diagnoses", and recommended a substantially similar course of "treatment" for both of them.

111.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova frequently issued substantially similar "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically

unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in almost every case, did not require the treatment.

112.    Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

113.    In the claims for initial examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely falsely represented that the putative examinations involved medical decision-making of high complexity in order to provide a false basis to bill for the initial examinations under CPT code 99205 because examinations billable under CPT code 99205 are reimbursable at a higher rate than examinations involving low medical decision-making or examinations that do not require any complex medical decision-making at all.

## 2.    The Fraudulent Charges for Follow-Up Examinations

114.    In addition to their fraudulent initial examinations, Glenmore Medical often purported to subject the Insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

115.    As set forth in Exhibit "1", Daly, Boubert, Burnett, and Mashkabova purported to perform virtually all of the putative follow-up examinations on behalf of Glenmore Medical, which were then billed to GEICO under CPT code 99214, typically resulting in a charge of $127.41 for each purported follow-up examination.

116.    Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova's billing for their purported follow-up examinations was fraudulent because it misrepresented their eligibility to collect No-Fault Benefits in the first instance.

117.    In fact, the Defendants never were eligible to collect No-Fault Benefits in the claims for follow-up examinations that are identified in Exhibit "1" because they engaged in unlawful and fraudulent conduct as described and set forth herein.

118.    Moreover, and as set forth below, the Defendants' charges for the putative follow-up examinations identified in Exhibit "1" were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

119.    For instance, in the claims for follow-up examinations that are identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely misrepresented the severity of the Insureds' presenting problems.

120.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

121.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

122.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)    Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-

grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)    Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

123.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

124.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity at the outset and improved over time.

125.    By the time the Insureds in the claims identified in Exhibit "1" presented to Glenmore Medical for the putative follow-up examinations, the Insureds either did not have any

genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

126.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely billed for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity at the time of the purported examinations, despite the fact that the purported examinations were provided long after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

127.    For example:

(i)    On February 20, 2021, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured as a result of the accident. In keeping with the fact that JC was not seriously injured as a result of the accident, JC was not transported to any hospital emergency department following the accident. To the extent that JC experienced any injuries at all as a result if the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of JC by Daly, on behalf of Glenmore Medical, on August 10, 2021 – more than five months after the accident – Glenmore Medical and Daly billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JC continued to present with problems of moderate to high severity at the time of the examination.

(ii)    On April 21, 2021, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured as a result of the accident. In keeping with the fact that MR was not seriously injured as a result of the accident, MR was not transported to any hospital emergency department following the accident. To the extent that MR experienced any injuries at all as a result if the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of MR by Daly, on behalf of Glenmore Medical, on August 25, 2021 – more than four months after the accident – Glenmore Medical and Daly billed GEICO for the

follow-up examination using CPT code 99214, and thereby falsely represented that MR continued to present with problems of moderate to high severity at the time of the examination.

(iii)    On August 14, 2021, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that MP had complaints of pain at the scene, but was not transported to any hospital emergency department following the accident. To the extent that MP experienced any injuries at all as a result if the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of MP by Burnett, on behalf of Glenmore Medical, on June 8, 2022 – more than nine months after the accident – Glenmore Medical, Daly, and Burnett billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MP continued to present with problems of moderate to high severity at the time of the examination.

(iv)    On August 18, 2021, an Insured named JY was involved in an automobile accident. The contemporaneous police report indicated that JY's vehicle was drivable following the accident. The police report further indicated that JY was not injured as a result of the accident. In keeping with the fact that JY was not seriously injured as a result of the accident, JY was not transported to any hospital emergency department following the accident. To the extent JY experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of JY by Burnett, on behalf of Glenmore Medical, on January 17, 2022 – more than six months after the accident – Glenmore Medical, Daly, and Burnett billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JY continued to present with problems of moderate to high severity at the time of the examination.

(v)    On September 19, 2021, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured as a result of the accident. In keeping with the fact that JC was not seriously injured as a result of the accident, JP was not transported to any hospital emergency department following the accident. To the extent that JP experienced any injuries at all as a result if the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of JP by Mashkabova, on behalf of Glenmore Medical, on January 3, 2022 – more than three months after the accident – Glenmore Medical, Daly, and Mashkabova billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JP continued to present with problems of moderate to high severity at the time of the examination.

(vi)     On November 9, 2021, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that MI's vehicle was drivable following the accident. The police report further indicated that MI was not injured, did not complain of any pain at the scene, and was not treated at the scene of the accident. Nonetheless, MI presented at LIJ Hospital following the accident and was discharged shortly thereafter with no serious injury diagnosis. To the extent that MI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MI by Burnett, on behalf of Glenmore Medical, on February 15, 2022 – more than three months after the accident – Glenmore Medical, Daly, and Burnett billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MI continued to present with problems of moderate to high severity at the time of the examination.

(vii)    On April 2, 2022, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that BM's airbags did not deploy, and BM's vehicle sustained functional damage. BM was transported to Norwalk Hospital, Norwalk, Connecticut, following the accident and was discharged shortly thereafter with no serious injury diagnosis. To the extent that BM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of BM by Boubert, on behalf of Glenmore Medical, on August 8, 2022 – more than four months after the accident – Glenmore Medical, Daly, and Boubert billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that BM continued to present with problems of moderate to high severity at the time of the examination.

(viii)   On April 3, 2022, an Insured named RN was involved in an automobile accident. The contemporaneous police accident report indicated that RN was not injured and did not complain of any pain at the scene. In keeping with the fact that RN was not seriously injured as a result of the accident, RN was not treated at the scene of the accident, nor did RN visit any hospital emergency department following the accident. To the extent RN experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examinations of RN by Mashkabova, on behalf of Glenmore Medical, on May 24, 2022, and by Burnett, on behalf of Glenmore Medical, on July 7, 2022, Glenmore Medical, Daly, Mashkabova and Burnett billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that RN continued to present with problems of moderate to high severity at the time of the examinations.

(ix)     On October 20, 2022, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at the scene. In keeping with the fact that JS was not seriously injured as a result of the accident, JS was not treated at the scene of the accident, nor did JS visit any hospital emergency department following the accident. To the extent that JS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of JS by Burnett, on behalf of Glenmore Medical, on January 23, 2023 – more than three months after the accident – Glenmore Medical, Daly, and Burnett billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JS continued to present with problems of moderate to high severity at the time of the examination.

(x)      On April 27, 2022, an Insured named NS was involved in an automobile accident. The contemporaneous police report indicated that NS's vehicle was drivable following the accident. The police report further indicated that NS was not injured as a result of the accident. In keeping with the fact that NS was not seriously injured as a result of the accident, NS was not transported to any hospital emergency department following the accident. To the extent that NS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow up examination of JP by Mashkabova, on behalf of Glenmore Medical, on June 29, 2022 – more than two months after the accident – Glenmore Medical, Daly, and Mashkabova billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that NS continued to present with problems of moderate to high severity at the time of the examination.

128.    These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations – which often were months after the minor accidents – or else their presenting problems were minimal.

129.    In the claims for follow-up examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova routinely falsely represented that the Insureds

presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at a higher rate than examinations involving presenting problems of minimal severity, or no severity.

130.   In the claims for follow-up examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

131.   Moreover, pursuant to the applicable Fee Schedule, when Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

132.   In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

133.   Rather, following their purported follow-up examinations, Glenmore Medical, Daly, Boubert, Burnett, and Mashkabova simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds undergo medically unwarranted arthroscopic surgical procedures and/or continue to receive additional, medically

unnecessary chiropractic, physical therapy, acupuncture, and/or related services from the No-Fault Clinics and the Referring Providers.

134.    In keeping with the fact that the putative "results" of the follow-up examinations were false, Daly, Boubert, Burnett, and Mashkabova routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

135.    In the claims for follow-up examinations identified in in Exhibit "1", the Defendants routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these false diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations and surgical procedures, as well as for the medically unnecessary return referrals to the No-Fault Clinics and Referring Providers for the continued performance of medically unnecessary chiropractic, physical therapy, acupuncture, and related services.

**3.    The Fraudulent and Unlawful Charges for Arthroscopic Surgical Procedures**

136.    In the claims identified in Exhibit "1", pursuant to the Defendants' unlawful referral scheme, and based upon the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations and follow-up examinations, Glenmore Medical, Daly, Fayzulayev, Han, and Leonardo purported to subject many Insureds to a series of fraudulent and medically unnecessary surgical procedures, including arthroscopies.

137.    As set forth in Exhibit "1", Glenmore Medical, Daly, Fayzulayev, Han, and Leonardo then billed the surgical procedures to GEICO under various CPT codes, including CPT

codes 20605, 20610, 23405, 23406, 23700, 26055, 29805, 29806, 29807, 29819, 29821, 29822, 29823, 29824, 29825, 29826, 29827, 29834, 29840, 29844, 29845, 29846, 29860, 29873, 29874, 29876, 29877, 29879, 29880, 29881, 29882, 29884, 29894, 29895, 29898, and 29999.

138.    Like the charges for the other Fraudulent Services, the charges for the surgical procedures identified in Exhibit "1" were fraudulent in that the surgical procedures were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' unlawful referral scheme, and the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations and follow-up examinations.

139.    Moreover, in the claims for surgical procedures identified in Exhibit "1", the charges for the surgical procedures were fraudulent in that they misrepresented the Defendants' eligibility to collect No-Fault Benefits in the first instance.

140.    By the time Glenmore Medical, Daly, Fayzulayev, Han, and Leonardo purported to provide the surgical procedures, the Insureds had either no presenting problems at all, or their presenting problems consisted of minor sprains, strains, and similar soft tissue injuries that were in the process of being resolved through conservative treatment, or without any treatment at all.

141.    Even so, in the claims for surgical procedures identified in Exhibit "1", Glenmore Medical, Daly, Fayzulayev, Han, and Leonardo routinely purported to provide surgical procedures to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the procedures.

142.    For example:

(i)    On August 14, 2021, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that MP had complaints of pain at the scene, but was not transported to any hospital emergency department. To the extent that MP experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require

any surgical procedures. Even so, on July 9, 2022, Daly and Glenmore Medical purported to perform arthroscopic shoulder surgery on MP, despite the fact that MP had not suffered any serious injury as the result of the relatively minor accident. Daly and Glenmore Medical then billed GEICO more than $11,000.00 for the procedures on MP, which were medically unnecessary.

(ii)     On November 9, 2021, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that MI was not injured, and MI was not treated at the scene of the accident. The police report further indicated that MI's airbags did not deploy, and MI's vehicle was drivable following the accident. Nonetheless, MI presented later that day to LIJ Medical Center where MI was briefly observed on an outpatient basis and discharged shortly thereafter with no serious injury diagnosis. To the extent MI experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on January 15, 2022, Daly, Fayzulayev, and Glenmore Medical purported to perform arthroscopic shoulder surgery on MI, despite the fact that MI had not suffered any serious injury as the result of the relatively minor accident. Then, on March 5, 2022, Daly, Fayzulayev, and Glenmore Medical purported to perform arthroscopic knee surgery on MI, despite the fact that MI had not suffered any serious injury as the result of the relatively minor accident. Daly, Fayzulayev, and Glenmore Medical then billed GEICO more than $12,000.00 and $11,000.00, respectively, for the procedures, which were medically unnecessary.

(iii)     On December 3, 2021, an Insured named WM was involved in an automobile accident. The contemporaneous police report indicated that WM's was drivable following the accident. The police report further indicated that WM was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that WM was not seriously injured, WM did not visit any hospital emergency room following the accident. To the extent that WM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on February 26, 2022, Daly, Han, and Glenmore Medical purported to perform arthroscopic knee surgery on WM, despite the fact that WM had not suffered any serious injury as the result of the relatively minor accident. Daly, Han, and Glenmore Medical then billed GEICO more than $12,000.00 for the procedure, which was medically unnecessary.

(iv)     On January 4, 2022, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured, CH was not treated at the scene of the accident, nor did CH visit any hospital emergency department following the accident. To the extent CH experienced any injuries at all as a result of the accident, they were of low or minimal severity at the

outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on April 16, 2022, Daly, Han, and Glenmore Medical purported to perform arthroscopic shoulder surgery on CH, despite the fact that CH had not suffered any serious injury as the result of the relatively minor accident. Daly, Han, and Glenmore Medical then billed GEICO more than $13,000.00 for the procedure, which was medically unnecessary.

(v)    On September 2, 2022, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured as a result of the accident, AR was not transported to any hospital emergency department following the accident. To the extent that AR experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on February 7, 2023, Daly, Leonardo, and Glenmore Medical purported to perform arthroscopic knee surgery on AR, despite the fact that AR had not suffered any serious injury as the result of the relatively minor accident. Daly, Leonardo, and Glenmore Medical then billed GEICO more than $11,000.00 for the procedure, which was medically unnecessary.

(vi)   On April 2, 2022, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that BM's airbags did not deploy, and BM's vehicle sustained functional damage. BM was transported to Norwalk Hospital, Norwalk, Connecticut, following the accident and was discharged shortly thereafter with no serious injury diagnosis. To the extent that BM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on October 8, 2022, Daly, Han, and Glenmore Medical purported to perform arthroscopic knee surgery on BM, despite the fact that BM had not suffered any serious injury as the result of the relatively minor accident. Daly, Han, and Glenmore Medical then billed GEICO more than $13,000.00 for the procedure, which was medically unnecessary.

(vii)  On April 3, 2022, an Insured named RN was involved in an automobile accident. The contemporaneous police accident report indicated that RN was not injured and did not complain of any pain at the scene. In keeping with the fact that RN was not seriously injured as a result of the accident, RN was not treated at the scene of the accident, nor did RN visit any hospital emergency department following the accident. To the extent RN experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on June 18, 2022, Daly,

Fayzulayev, and Glenmore Medical purported to perform arthroscopic knee surgery on RN, despite the fact that RN had not suffered any serious injury as the result of the relatively minor accident. Daly, Fayzulayev, and Glenmore Medical then billed GEICO more than $7,000.00 for the procedure, which was medically unnecessary.

(viii)   On May 18, 2022, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured as a result of the accident, SA was not treated at the scene of the accident, nor did SA visit any hospital emergency department following the accident. To the extent SA experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on September 18, 2022, Daly and Glenmore Medical purported to perform arthroscopic knee surgery on SA, despite the fact that RN had not suffered any serious injury as the result of the relatively minor accident. Daly and Glenmore Medical then billed GEICO more than $9,000.00 for the procedure, which was medically unnecessary.

(ix)   On October 20, 2022, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured as a result of the accident, AS was not treated at the scene of the accident, nor did AS visit any hospital emergency department following the accident. To the extent AS experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on March 18, 2023, Daly, Han, and Glenmore Medical purported to perform arthroscopic shoulder surgery on AS, despite the fact that AS had not suffered any serious injury as the result of the relatively minor accident. Daly, Han, and Glenmore Medical then billed GEICO more than $8,000.00 for the procedure, which was medically unnecessary.

(x)   On February 9, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that JP was not injured, JP was not treated at the scene of the accident, nor did JP visit any hospital emergency department following the accident. To the extent JP experienced any injuries at all as a result of the accident, they were of low or minimal severity at the outset, improved over time, had completely resolved or were minimal within a few weeks of the accident, and did not legitimately require any surgical procedures. Even so, on March 18, 2023, Daly, Han, and Glenmore Medical purported to perform arthroscopic shoulder surgery on JP, despite the fact that JP had not suffered any serious injury as the result of the relatively minor accident. Daly, Han, and

Glenmore Medical then billed GEICO more than $8,000.00 for the procedure, which was medically unnecessary.

143.    These are only representative examples. In the claims for surgical procedures identified in Exhibit "1", Glenmore Medical and Daly, Fayzulayev, Han, and Leonardo routinely falsely represented that the procedures were medically necessary, when in fact they were not.

**C.    Glenmore Medical's Unlawful Operations in New Jersey**

144.    As set forth above, New Jersey law prohibits foreign medical professional corporations from operating as medical practices in New Jersey.

145.    Insurers are not required to pay No-Fault Benefits for healthcare services that are unlawfully provided in New Jersey through foreign medical professional corporations.

146.    Glenmore Medical is a New York medical professional corporation. Glenmore Medical is not and has never been a New Jersey professional corporation.

147.    Accordingly, Glenmore Medical could not lawfully provide medical or other professional services in the state of New Jersey.

148.    Even so, in the claims identified in Exhibit "1", Daly, Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova routinely caused Glenmore Medical to unlawfully provide purported medical services in New Jersey, which then were billed to GEICO.

149.    For example:

(i)    On October 30, 2021, Daly and Fayzulayev, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures to an Insured named ED at a surgery center located at 550 Newark Avenue, Jersey City, New Jersey. Thereafter, Glenmore Medical, Daly, and Fayzulayev billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(ii)    On February 26, 2022, Daly and Han, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on three Insureds named CB, WM, and IR, at a surgery center located at 550 Newark

56

Avenue, Jersey City, New Jersey. Thereafter, Glenmore Medical, Daly, and Han billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(iii)   On August 23, 2022, Daly and Fayzulayev, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on two Insureds named BJ and CB at a surgery center located at 1608 Lemoine Avenue, Suite 101, Fort Lee, New Jersey. Thereafter, Glenmore Medical, Daly, and Fayzulayev billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(iv)   On September 27, 2022, Daly and Han, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on three Insureds named AC, DP, and BP, at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Han billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(v)   On October 4, 2022, Daly and Leonardo, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on seven Insureds named LB, FD, OP, EE, IP, RV, and HV, at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Leonardo billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(vi)   On November 15, 2022, Daly and Leonardo, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on five Insureds named DL, SM, FM, WR, and AS, at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Leonardo billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(vii)   On February 7, 2023, Daly and Leonardo, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on five Insureds named AR, YC, VN, CT, and DW at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Leonardo billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits

in connection with these services because it could not lawfully provide medical services in New Jersey.

(viii)  On April 25, 2023, Daly and Han, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on five Insureds named WK, NC, WK, YP, and JR at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Han billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(ix)  On May 16, 2023, Daly and Leonardo, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures on four Insureds named AA, RA, YB, and JD at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Leonardo billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

(x)  On December 5, 2023, Daly and Leonardo, on behalf of Glenmore Medical, purported to provide medical services in the form of arthroscopic surgical procedures to an Insured named AB at a surgery center located at 680 Kinderkamack Road, Suite 100, Oradell, New Jersey. Thereafter, Glenmore Medical, Daly, and Leonardo billed GEICO for these purported services, despite the fact that Glenmore Medical was ineligible to receive No-Fault Benefits in connection with these services because it could not lawfully provide medical services in New Jersey.

213.  These are only representative examples. All the claims for Fraudulent Services identified in Exhibit "1" for services that purportedly were provided in New Jersey were provided in violation of New Jersey law, because Glenmore Medical lacked the authority to operate as a medical practice in New Jersey.

**D.    The Fraudulent and Unlawful Billing for Independent Contractor Services**

214.  The Defendants' fraudulent scheme also included the submission of claims through Glenmore Medical to GEICO seeking payment – under New York automobile insurance policies

and the New York No-Fault Laws – for services performed by independent contractors, including Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova.

215.    As set forth above, under the No-Fault Laws, healthcare providers are ineligible to bill for or receive payment for healthcare services that are performed by independent contractors – the healthcare services must be performed by the healthcare providers, themselves, or by their employees.

216.    Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova never were employed by Glenmore Medical or Daly – rather, they were independent contractors.

217.    For instance, Glenmore Medical and Daly:

(i)      established an understanding with Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova that they were independent contractors, rather than employees;

(ii)     permitted Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova to maintain non-exclusive relationships and perform services on behalf of other, competing healthcare providers;

(iii)    permitted Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova to set their own schedules and days on which they desired to perform services;

(iv)     paid Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(v)      paid no employee benefits to Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova;

(vi)     failed to secure and maintain W-4 or I-9 forms for Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova;

(vii)    failed to withhold federal, state or city taxes on behalf of Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova;

(viii)   compelled Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova to pay for their own malpractice insurance at their own expense; and

(ix)     failed to cover Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova for either unemployment or workers' compensation benefits.

218.    By electing to treat Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova as independent contractors, Glenmore Medical and Daly realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova.

219.    Because Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova were independent contractors, Glenmore Medical and Daly never had any right to bill for or collect No-Fault Benefits in New York in connection with Boubert, Burnett, Fayzulayev, Han, Leonardo, and Mashkabova's services.

220.    Even so, the Defendants routinely sought payment under the New York No-Fault insurance laws and GEICO's New York No-Fault insurance policies, as if the Fraudulent Services had been provided by actual employees of Glenmore Medical to make it appear as if the services were eligible for reimbursement.

221.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

III.    <u>The Fraudulent Billing Submitted to GEICO</u>

150.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through Glenmore Medical, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

151.    As described above, the bills and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing healthcare practice, including licensing laws, and therefore were eligible to receive no-fault reimbursement. In fact, the Defendants were not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New York, including licensing laws, and therefore were not eligible to receive no-fault reimbursement..

(ii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing healthcare practice, including licensing laws, and therefore were eligible for no-fault reimbursement. In fact, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice, including licensing laws, and therefore were not eligible for PIP reimbursement.

(iii)    The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

(v)    The bills and treatment reports submitted or caused to be submitted by the Defendants often falsely represented that Glenmore Medical was entitled to no-fault reimbursement for the Fraudulent Services, when in fact it was not because the Fraudulent Services had been performed – to the extent that they were performed at all – by independent contractors.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

152.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

153.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

154.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

155.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

156.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

157.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they were performed at all, by independent contractors.

158.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,300,000.00.

159.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Glenmore Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

160.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs 1-159 set forth above.

161.    There is an actual case in controversy between GEICO and Glenmore Medical regarding more than $285,000.00 in unpaid fraudulent billing for the Fraudulent Services that has been submitted to GEICO through Glenmore Medical.

162.    Glenmore Medical has no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activities described herein.

163.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Glenmore Medical has no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
### Against Daly
### (Violation of RICO, 18 U.S.C. § 1962(c))

164.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs 1-159 set forth above.

165.    Glenmore Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

166.    Daly knowingly conducted and/or participated, directly or indirectly, in the conduct of Glenmore Medical's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Glenmore Medical was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) Glenmore Medical unlawfully operated in New Jersey as a foreign professional corporation and billed for services performed by independent contractors; and (vii) neither Glenmore Medical nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

167. Glenmore Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Daly has operated Glenmore Medical, inasmuch as Glenmore Medical is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Glenmore Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Daly continues to attempt collection on the fraudulent billing submitted through Glenmore Medical to the present day.

168. Glenmore Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Glenmore Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

169. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through Glenmore Medical.

170. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo
### (Violation of RICO, 18 U.S.C. § 1962(d))

171. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs 1-159 set forth above.

172.    Glenmore Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

173.    Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo are employed by and/or associated with the Glenmore Medical enterprise.

174.    Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of  Glenmore Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than three years seeking payments that Glenmore Medical was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (vi) Glenmore Medical unlawfully operated in New Jersey as a foreign professional corporation, and billed for services that had been performed by independent contractors; and (vii) neither Glenmore Medical nor the underlying services were in compliance with applicable law. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

175.    Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo knew of, agreed to and acted in furtherance of the common overall objective of the Glenmore Medical enterprise (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

176.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through Glenmore Medical.

177.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
**Against Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo**
**(Common Law Fraud)**

178.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs 1-159  set forth above.

179.    Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

180.    The false and fraudulent statements of material fact and acts of fraudulent concealment include, in every claim identified in Exhibit "1": (i) the representation that Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo were in compliance with all significant laws and regulations governing healthcare practice including licensing laws, and were eligible to receive No-Fault Benefits, when in fact they were not; (ii) the

concealment of the Defendants' illegal kickback and referral scheme; (iii) the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for no-fault reimbursement, when in fact they were not.

181.    Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Glenmore Medical that were not compensable under the No-Fault Laws.

182.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted by Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo through Glenmore Medical.

183.    Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

184.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo**
**(Unjust Enrichment)**

185.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs 1-159 set forth above.

186.    As set forth above, Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

187.    When GEICO paid the bills and charges submitted by or caused to be submitted by Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo through Glenmore Medical for No-Fault PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

188.    Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

189.    Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

190.    By reason of the above, Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,300,000.00.

## JURY DEMAND

191.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Glenmore Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Glenmore Medical has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Daly, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Glenmore Medical, Daly, Boubert, Burnett, Mashkabova, Fayzulayev, Han, and Leonardo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Glenmore Medical, Daly, Boubert, Burnett,

Mashkabova, Fayzulayev, Han, and Leonardo, more than $1,300,000.00 in compensatory

damages, plus costs and interest and such other and further relief as this Court deems just and

proper;

Dated: January 2, 2025

                          RIVKIN RADLER LLP

            By:    /s/ Max Gershenoff
                   Barry I. Levy, Esq.
                   Max Gershenoff, Esq.
                   Caitlin Cash, Esq.
                   Peter Henninger, Esq.
                   926 RXR Plaza
                   Uniondale, New York 11556
                   (516) 357-3000
                   *Counsel for Plaintiffs Government Employees
                   Insurance Company, GEICO Indemnity Company,
                   GEICO General Insurance Company, and GEICO
                   Casualty Company*